The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. Good morning. We'll hear argument in our first case, Kayla Butts v. United States of America. Mr. Salzman. Thank you, Your Honor, and may it please the Court. Joshua Salzman on behalf of the United States. The very evidence and expert testimony credited by the district court here serves only to establish that Dr. Sarah Hardy did not commit malpractice when she entrusted a newborn infant to a board certified experienced neonatologist who was already present at Berkeley Medical Center. For this and other reasons, the liability verdict cannot stand. But even if this court disagrees, at a bare minimum, the damages award exceeds what's allowable under West Virginia law. West Virginia provides prevailing plaintiffs with one complete recovery, but because the district court wrongly denied certain offsets that we had sought, plaintiffs were awarded more. Before I go through the specific arguments and defects in the district court's rulings here, I think it might be helpful to step back and briefly review the chronology because it's quite critical to understanding the errors in this case. The infant, AF, was born shortly before 9 a.m. Dr. Hardy, who's a pediatrician, showed up at 915 and was responsible for AF for only the next five and a half hours. There is no evidence that AF actually suffered any injury during those five and a half hours. Plaintiffs' experts disclaimed any ability to pinpoint the time of injury. Moreover, throughout those five and a half hours, AF consistently maintained oxygen saturation levels above the 90% threshold that plaintiffs' own expert identified as sort of the standard to avoid hypoxia. In the early afternoon, Dr. Hardy consults with the patient and says, could we transfer this infant to the NICU, to the neonatal intensive care unit over in Winchester, Virginia? Dr. Peruitt tells her, no, that's not necessary. I'm prepared to take this baby onto my service. I can provide adequate care here. Dr. Miller opines that the baby should have been transferred soon after birth or at least during the time of Dr. Hardy's care prior to any effective under the procedures or not. Based on that, why don't we just have a classic situation where there are two experts saying one thing, two experts saying another, and the fact finder is there to decide who's most credible? Sure. Well, what makes this case a little different is, first of all, we have a credibility finding from the district court. The district court told us the expert who was most credible on standard of care was a different one of Dr. John Partridge, and what Dr. Partridge testified to was that Dr. Peruitt was capable of providing adequate care at Berkeley until 11 p.m. that night or 1115, which was some eight hours after Dr. Peruitt stepped in for Dr. Hardy. Moreover, Dr. Miller also acknowledged that she couldn't pinpoint the time of MaxCare Nursery, and as a result, she really didn't have a foundation for offering the opinion that Berkeley was inadequate to AF's needs. The only piece of equipment that was ever identified as being missing from Berkeley but present at the Winchester NICU was something called a CPAP machine, and both Dr. Miller and Dr. Partridge testified that CPAP was not necessarily required and just one of several available options. Can I ask you a question about that? Everybody does seem to agree, though, or maybe you dispute this, that by around 11 o'clock that night, the standard of care required a transfer to the NICU? Yes. Our expert said by 1130 that night. Dr. Partridge also said the first time he had enough information to transfer was 1115. And given that CPAP was the only thing that was missing and it wasn't required, why was a transfer necessary at 11 o'clock? So by then, Dr. Pruitt had made a number of treatment decisions that plaintiff's experts testified were below the standard of care, and AF's condition, sadly, had tragically deteriorated substantially. But then at that point, I'm not saying that the only difference the two facilities is CPAP. One other thing, for example, that you have at a NICU there was some testimony about is staffing levels. So Berkeley had one neonatologist. They brought in that neonatologist who was providing care. But one neonatologist can't provide bedside coverage around the clock indefinitely. At some point, you do need a neonatologist at the bedside. Once you have this infant starting at around 9 p.m. suffering these apnea episodes where she stops breathing and things like that, at that point, you do need the higher level of care that's available in a NICU. But there was no testimony that that higher level of care would have made a difference earlier during the day? Other than that one unexplained or unelaborated upon piece of testimony from Dr. Miller, there wasn't, no. And what I think this discussion has also highlighted, though, is that the role that Dr. Peruit played in all of this and the district court's failure, I want to emphasize the district court's complete failure to engage with the significance of Dr. Peruit's involvement here. You have testimony from plaintiff's experts that Dr. Peruit committed multiple breaches of standard of care, that he did several things that violate the standard of care, including his own failure to transfer AF to the NICU as, tragically, her condition deteriorated substantially on his watch. But he also made some affirmative treatment decisions that plaintiffs say fell below the standard of care. Despite that— To what extent should we be reading Dr. Partridge's? I mean, I read, I accept what you're saying. Dr. Partridge doesn't really ever exactly say that he should have been, the child should have been transferred earlier in the day. But he does say that based on Dr. Hardy's own subjective standards, that that was the basis, as I read Dr. Partridge, for saying that he, too, agreed that the baby should have been transferred under Dr. Hardy's own subjective understanding. Is that what you read Dr. Partridge to be saying? Yeah, I do read Dr. Partridge to put emphasis on Dr. Hardy's own subjective impression. I think that's a mistake for two reasons. One reason is because West Virginia courts tell us that the standard of care is supposed to be objective. The second problem with that is even if Dr. Hardy thought that she couldn't provide adequate care at Berkeley anymore, she didn't continue to provide care. She did exactly what Dr. Partridge says was required when she elevated to a higher level of care within Berkeley by bringing in the neonatologist. And Dr. Partridge testified, and this is at JA 526 and 527, that Dr. Peruit's own standard for transfer, if we're going to go down the road of looking at subjective standards, didn't require transfer until much later in the evening, eight or nine hours after Dr. Peruit had assumed from Dr. Hardy. So if you're going to read Dr. Partridge's testimony there, that's fine. Maybe Dr. Hardy couldn't continue to provide adequate care. But it's not that she kept the child. She brought in the specialist. And as a result, gave the child access to the level of care that Dr. Partridge himself testified was what was necessary here. And so when we read Dr. Partridge's testimony, at some point, Dr. Partridge is a little, I think appropriately, I think he was quite credible, but didn't really come out and say that the standard of care was ever breached. But he says at some point the child should have been transferred earlier in the day. And I read that as being transferred to somebody other than Dr. Hardy. And that could be Dr. Peruit, which he talks about later. It could have been the NICU. It could have been lots of other options. But that he was saying at that juncture, Dr. Hardy wasn't able to care for him. But as Dr. Partridge came back later and explained, Dr. Peruit would have been capable. Now, he didn't do it, but he would have been capable of providing that kind of care. I think that is the best reading of the testimony. And I think when you understand that that was the testimony about the standard of care, the undisputed evidence establishes that Dr. Hardy complied with the standard of care by elevating to a higher level within Berkeley Medical Center, which is what Dr. Partridge testified was an alternative to a transfer to a NICU. Go back, if you could, to your comment that under West Virginia law there's a requirement of an objective standard of care. And I've read that too. And I'm trying to make as much sense of that as I can. Does that to the United States mean that you have to have certain readings of, you know, gas readings, blood gas readings, or certain objective readings? What does that mean? How objective does the government say that standard needs to be? I don't think it's if she's at 92% you keep her. If it's at 91, then she has to be transferred. But what I do think it means is that if you have an overcautious doctor, for example, who's just less comfortable, the facility isn't necessarily inadequate. And maybe she has the knowledge and training to do it. But she's just somebody who's very overcautious and normally sends children to the NICU, even if it's not necessarily medically required. I don't think the standard of care is breached if she elects in a particular case to keep the child there. Your own subjective view is not ultimately going to control here. It's what a reasonable doctor, as understood by what's common in the medical profession, would deem to be reasonable under those circumstances. So I think that's the relevant standard here. And under those standards, Dr. Hardy, as the relevant standard was defined by Dr. Partridge, Dr. Hardy complied with the standard of care. What's the... I'm shifting gears to some of the damages-related issues. The motion to under Rule 52B that was filed to set off the settlements of other defendants, settling defendants. What's the authority that you have... I didn't... that that's the appropriate way to move for set-offs. My experience and understanding is maybe a little different than that, and I didn't see anything in the papers that, you know, that suggested that was the appropriate vehicle for that. So two things, Your Honor. One is West Virginia courts have consistently said there's no one right way to do this, and you can see that in the Hardin and the Groves case. The other thing I would say is if you look at the statute, and in particular I'm talking about 755... I don't mean to interrupt you, but do we look to West Virginia law to determine the timeliness of the assertion of a right? In this case, I think you do, because it's a matter of substantive law. I think we win either way, but the reason I think it's substantive is if you look at the statute, and I'm talking particularly here about 557B-9 subsections D and E, and the way that statute is written, it says the district court shall deduct this... these amounts before making final judgment, the pre-verdict settlements, and then in subsection E calls it a mandatory reduction. So I think this is an entitlement under state substantive law. But even if you disagree, you'll note that we cited, for example, a Tenth Circuit case as well. Other jurisdictions allow these issues to be brought to the court's attention at some later point. The other thing about the timing issue that I think is very important here is that there wasn't a clear window to do this beforehand. The subsection D of the statute says the pre-verdict settlement is supposed to happen after the collateral source hearing set off. Here, the district court entered final judgment on the same day that it issued its verdict on the collateral source hearing. So as a result, a timely post-judgment motion, I think, was a totally reasonable way to bring this to the court's attention. Was it addressed pre-judgment at all? I don't know that there was a claim for the set-off that was put in before judgment, but the court was certainly well aware of the settlements because they were approved. Did the United States raise the issue formally or informally that we got set-off issues at all before the issue, before the judgment was entered? Not that I'm aware of, Your Honor. Can I ask a slightly different question? If the court were to apportion damages, would that alleviate the need, at least in the majority of cases, to address set-off? So in other words, if the court were to apportion fault and say, okay, the hospital's 25 percent responsible, Prewitt's 25 percent responsible, and Hardy's 50 percent responsible, I'm just going to get set-off on top of that. Is that correct? So the statute lays out the methodology, and this is in subsection D of that same statutory provision we've been talking about. There's an order of operations here. You perform a calculation and figure out sort of what the maximum exposure is without the set-off. So if I'm 30 percent responsible on $100 judgment, the most I can be responsible for is $30. You then look at the settlements and you say, oh, if there was a settlement for $80 here, I'm not liable for the full 30. There's going to be a reduction to account for that in the calculus. And this is all laid out in the statute as to how the order of operations works. But it's not that you would go down to zero. There'd be some— It depends on the size of the settlement and the percentages, but yes, I think you wouldn't go down to zero here. But again, all of this is laid out in the statute as to how this should operate. I see I'm almost out of initial time. Does the court have any additional questions? Thank you. May it please the court. My name is Barry Nace and I'm one of the attorneys representing the plaintiffs in this case. Let me begin with the issue of negligence and causation because I think it's been missed a little bit here. First of all, in order to reverse or change Judge Groh's order, there has to be clear and convincing evidence to start with that. But what the plaintiff has to show is what the standard of care is and that it was violated and that was a cause. We need testimony on that respect. We have that. In fact, even Dr. Perwitt, if you look on page 500 of the appendix, says that it was at noon that the transfer should have taken place. But tell me or tell the court, what is the standard of care? I understand there's lots of testimony that it should have been transferred. I understand that there's a lot of testimony that Dr. Hardy did something wrong. But tell me what succinctly the standard of care is that you say has been violated. In this case. In this case, correct. The standard of care was this child needed to be in a NICU, a neonatal intensive care unit, so that she could receive the treatment that she needed, which included CPAP, which is actually forcing oxygen in. But Dr. Miller said that she pointed out the difference and said CPAP was one difference but intubation was another. And that's the one Dr. Miller said she needed. She didn't say she needed CPAP. She said she needed intubation, correct? I know. I don't think that is correct. That's how, I thought that's how it reads at, maybe, let me get that. Regardless, before she's transferred, they tried CPAP, that didn't work, they intubated the kid, right? Right. We know as a factual matter, CPAP didn't work, that intubation did. They didn't do that either. They didn't do anything other than watch the child. They intubated, there's testimony at 571, J571, 895, that they did intubation. Not until way later, Dr. Harden didn't do any intubation at all. Nothing. In fact, from 915, she comes and looks at the child and watches the results and then she goes back to her office and she gets a call about something not looking good and she already decided herself because this hospital did not have a NICU. This is one of the craziest things about it. There was no NICU there. And we've got a child who's had a rough delivery to start with, who's got a lot of problems, and the pediatrician expert on our side said, you've got to get this child to the NICU so it can be taken care of. Can I ask this question? So I'm reading on your brief at page 15, and this is a point that matters to me, and so when I noticed this, this really drew my attention. You say that Dr. Partridge testified that the child should have been transferred at noon. And you cite to 486 and 498 of the JA. And 499 of 500 and 501. And so when I read those, I don't see that. And so I'm just trying to, I want to understand, and I think what you're saying, you know, I just want to make sure I understand what the argument is. The reference here to being transferred is not to the NICU, but it's to be transferred from Dr. Harding. Absolutely not. Transfer all the way through here is transfer to a facility that has a NICU, not transfer to some other doctor. What's the sense of transferring somebody to a neonatologist if you don't have a neonatology, you know, you can't do anything? This is really all about the CPAP machine for you? It's a, you know, it's about a CPAP machine and having care where people are standing there taking care of the baby one-on-one, watching what's going on. So that is... Was there testimony that people were not one-on-one with the infant at Berkeley watching what was going on? People that were watching were constantly saying, we got a problem here, let's do something. We can't do it. We have nothing we can do here. That's why they get transferred. That's why they've always been transferred from that hospital. You have testimony that one of the doctors was standing there saying there's nothing we can do? At the relevant time, at noon, there was a doctor standing there saying there's nothing we can do here? If you read Harding's testimony from the beginning, Harding would tell you that as soon as she saw this child, she believed that this child probably should be transferred. She was going to watch her and see what happens. And if it doesn't improve, when she comes back about noon, she's going to transfer to another hospital, not to another doctor, to another hospital. She was not familiar with the expertise that they existed, that existed with the doctor, the new doctor at that hospital. And she was informed of that and then made that decision that given that doctor's expertise, and I think given the hospital's ability to intubate, that she would transfer it to that doctor, transfer the baby to that doctor. But the word, right, but the word transfer is a little different in the sense that what there's, the word transfer all the way through here means transfer to a facility that has the ability to take care of a child like this, not transfer it to another doctor. And I can appreciate that if the reason for the transfer as articulated by your experts is that at a different facility, one, two, three can be done that couldn't be done there. But if the reason that needs to be transferred is because of intubation, and that is, I'm not trying to argue with you, but if you look at 755 and 756, that's what Dr. Miller said, that expertise I thought was available at Berkeley. That wasn't done either. Well, but you can't, that would be a different theory of malpractice, that you didn't do something at Berkeley that you should have done. If you wanted to make that theory, that might be a legitimate theory and we would evaluate it. But just because the facts block one theory doesn't allow you, I don't think, to shift to a different theory at the Fourth Circuit. No, but the question is, what would you do if you're the pediatrician at that point? That's what you've got, is a pediatrician. What is the standard of care for a pediatrician? What is she supposed to do? The testimony by the experts, not me, you know, but the experts say that this child, Dr. Miller, this child is to be transferred to a facility where they can do all the things that are necessary for the child. That's the testimony. Not the testimony. The testimony is to transfer so you can do intubation. I mean, I read it. I was looking for that very stuff. And if you look at 755 and 756 and they asked Dr. Miller why they should transfer the child, it was because they, at Inicu, you had CPAP and you had intubation. And then she, I think, yeah, that's a female. She said intubation is what this child needed. Well, if you look at 747 and 756 in the transcript. I'll look at that. What, 747 to 756? Yes, sir. Okay, thank you. I thought, am I not remembering this right? I thought that at least one of the plaintiff's experts said that as between intubation and the CPAP machine, it was sort of a management style choice which one you would use, that they were at the same level of intervention. But we're missing the point here. She didn't get either. No, no. But the point I'm trying to get at is what was available and necessary at the NICU that was not available at Berkeley. And if it's about the CPAP machine, why isn't it a problem that the plaintiff's own expert said, it's really just a management style choice which one you use. Nobody was saying the CPAP machine was necessary. Well, I don't agree with that analysis. But just as you said, I have to go with the expert. I'm going with the plaintiff's expert. I don't know the difference between those two methods of intervention. But the plaintiff's own expert is saying either one will do. And it's a management style choice. Let's put it this way. When the transport finally got there the next day, what did they do? The transport people, they had CPAP on the truck. And that's what they did right away. Started the CPAP machine going. And it didn't work. They used the intubation. It was too late. It was too late, basically. Well, no, no. But the CPAP wasn't too late. It just didn't work. So they used intubation. This is Judge Harris's point, is that sometimes you use CPAP, sometimes you use intubation. I'm with her. I got no idea whether your expert's right. But that's what your expert said. But they didn't intubate either. When they get there, they didn't do anything. That's the whole point. They needed. And that's kind of where I'm struggling. Because sometimes it seems like the theory is that the child should have been at a facility, a different facility. And then when we say, well, there's really no material difference in the facility based on the care that's needed. It seems like you go then, well, they didn't do the right care. And those are two different, it seems to me, theories of malpractice. One, you should have transferred. And the other, you should have done something else at the facility where you were. Well, when the expert says that this child is below the standard of care to not have this child in the NICU, that's the violation if they don't have the child in the NICU. That meets the requirement that we showed the standard of care was. Partridge doesn't say that, right? But Miller does. OK, but the judge doesn't credit Miller. Oh, yes, she does. We can talk about Miller. But I want to go back to Partridge, because Partridge says in the page before you cite as transfer means only to a different facility. In the page before, Partridge says she's transferred care to Dr. Pruitt. I mean, Dr. Partridge is using transferred in both senses, totally reasonably, right? Like you can transfer a child to a different doctor, or you can transfer a child. That's the way English language works. And so what I don't get is how we get out of Partridge anywhere that Partridge said, as you represent here, that the child should have been transferred to a NICU at noon. I don't see it anywhere. Let me read it. I'll read it right here. Starting on page 500, it says, the question was, was there a time that you believe that this child could have been taken off this course of respiratory problems that it had and been able to avoid the ultimate outcome here? Answer, there's no step change where I would say that certainly as the most significant would be the apnea episode. And that's great. Let me stop that. But the apnea episode, the one he's saying most significant, that's at night. A few hours later. Correct. And which you never get to if the child's in the NICU. But before that, Dr. Harding's notes said she was looking for a resolution of the early symptoms. They were still persisting at noon when she was either called about or called in. And she was concerned enough to transfer care to Dr. Pruitt. Which is a subjective view of Dr. Hardy, not an objective standard of care. That's the subjective view of Dr. Harder. She was concerned. That's her personal view. It's a fact. That's what she did. So at that point, certainly the child, I think, would have been far better served in a different hospital where there was a NICU. And is that, that's what I'm saying, is far better served, is that the standard of care? Is that sufficient? So if you just say, oh, someone would be better served at a different place, that's a violation of the standard of care. Let's keep going. I'm asking the question with this sentence first. I understand. I want to understand which sentence you're trying to point to. That's what I'm trying to understand. I'm saying this is leading up to what comes. So not this sentence. We're getting to the next one. I wanted more from the expert on that, OK? So I ask, OK, doctor, was there at that time, assuming that she's testified, that she came back to the hospital thinking that she was going to transfer the child to Winchester? Was there anything that was shown in the record that would indicate that the child didn't need to be sent to Winchester in light of the respiratory distress, hyperglycemia, and the blood gases, and so on? Is there anything in there that said that this child is going to get better? Not at that point. He's answering the last question that you asked there. Is there anything that said this child is going to get better? Not at this point. You can't tell. And the child, given the risk of the presumptive meconium, there was meconium found below the vocal cords, and the child's continuing symptoms with deteriorating blood gases, although not severely deteriorating, that child should have been transferred. And that's within a reasonable degree of medical probability? Absolutely. But in the previous page, he used the word transfer to refer to transfer to Dr. Pruitt. That's what I can't understand. I have no idea, based on this testimony, whether the transfer he's referring to is to a different facility or to Dr. Pruitt. Well, when Dr. Miller says the same thing, that she should have been transferred, and Judge Agro is sitting there watching everything, what's going on, as to what's going on here, it's clear that at noon, at noon when she comes back, when she is thinking of transferring, before somebody says, why don't you talk to this guy who's going to be opening our NICU next week, and doesn't have a NICU. It's not there. I mean, physically, there's nothing in there. There's no beds or anything. It's her responsibility. Pruitt, by the way, wasn't anybody that we even knew, our client even knew. Our client was being taken care of by Shenandoah and Hardy. That's Shenandoah. Pruitt had nothing to do with Shenandoah. Our client didn't even know that he got into the picture. So the question becomes here, realistically, what do we think our doctors are saying on this? What they're saying is, this child can't be taken care of with what we have here. That's why NICUs exist, so that we can take this kind of a child and put them in the NICU, so that they can be taken care of appropriately. Would it have made any difference? The expert testimony is, yes, it would have made a difference. This child had hypoxic ischemic encephalopathy. Every expert, except for the governments, agreed that that was due to the respiration issues. Every one. The one who didn't agree, they have now changed their mind in the brief. And they've said, oh, we're not saying that anymore. We agree. Let me interrupt you, because I understand that, and I've read it, and I agree with that aspect of the testimony. Is there anything? I did not see this, and I think that the government mentioned this in its oral argument, that there was not a point, at least before the child started being cared for by Dr. Perwitt, that your experts are able to discern that the damage that leads to her current condition was identified. I have never seen a case, this has been something we heard for the first time after the case was over, that you can't say exactly when this happened. That's not what we're required to do. We're required to. I'm sorry. Go ahead, I'll let you answer. No, you're doing fine, thank you. What we're required to do is present testimony that the standard of care is, and more likely than not, that's what caused the injury. That's what we did. You don't have to say it happened at 10 o'clock, 9 o'clock, 11 o'clock. You don't have to do that. That's true, but you have to establish proximate calls if you're attributing it to Dr. Hardy. And for the sake of discussion, that Dr. Hardy transferred the child at 1.30 or whenever that was to the other doctor there at Shenandoah, I think that the requirement of proximate calls would require you to say that the damage occurred based on what happened during that time period and not something that happened after the transfer within the same hospital. Well, yes, and that's exactly what Dr. Miller says on 747 and 756 and 767 and 768. That's what she says. And I also believe that's what Partridge says on the whole thing. And every doctor has agreed that it's a respiratory distress issue that caused the hypoxic ischemic cephalopathy and that she had that from the time she was born. She started having respiratory difficulties. You know, I would say that to ask me to what else would I possibly ask a witness besides what is the standard of care and, in your opinion, what did that cause? And I got the right answers for those questions. There's nothing more we could do on that. If you want me to pick a moment in time that this happened, I couldn't do that in good faith. Nobody could do that. But you do have the testimony that it was a violation of the standard of care and that that violation was a cause of what happened. And contrary to what the government said, you don't have to have the cause. It's a cause as to what happened on this whole thing. And that we had. And Judge Groh saw all the witnesses. And she saw what they said and how they behaved. And they have a witness with 150 times testifying. We have one that testified for the first time. That's where they. I mean, certainly credibility decisions are very much within the trial court's discretion. The issue is there has to be evidence on which that discretion can be exercised. And that's, I think, some of the questions we're asking. How do we ignore the testimony of the experts? There was no question ever even objected to, by the way. Nobody ever objected to what the expert said. Oh, I object. There's no foundation for that. That never happened in this case. What are we supposed to do on that? I just want to say one thing with respect to the process on the collateral source issues. First of all, we've cited in our brief the settlements that took place were collateral sources. That's a collateral source. There's a contract with the other defendants. And we cited the source that that's a collateral source. In addition, under West Virginia, there is a requirement. They have this big scheme. It changes every other year. But there's always this big scheme that tells you how to do things. And in this situation, what they said to do is you file for the collateral source issues before judgment, after verdict, and before judgment. That wasn't done here. That just wasn't done. And it's not my fault that it wasn't done. I'm sorry, but the premise here is that the settlement is a collateral source. Yes. Yeah. And with any collateral source, the scheme that West Virginia set up was as soon as we get the verdict, now we're going to set up a hearing on collateral source. And Judge Groh did that immediately. That's the time to come in and say, now here's what we want you to do. And it tells you how to do it, many, many, many steps to go through. That wasn't done. Do you agree that the final judgment, for the purpose of this discussion, the final judgment came after the collateral source hearing? Yes. And so what you're saying is that sometime before that, they needed to raise the set-off settlement issue? Between the verdict and the verdict. And the final judgment. Right. And the final judgment being what came after the other, they had a collateral source hearing, right? That's right. There was a hearing. So long as it was raised sometime before that, then it would have been appropriate. Yes. And it wasn't. Just simply wasn't done. My time is up. Thank you. Thank you, Your Honor. Just a couple of brief points. I think the court understands our arguments on liability. I just want to bring to the court's attention a couple of sites that confirm a few points that emerged during the discussion a moment ago. On the timing issue that Judge Quattlebaum raised, it is, in fact, true that neither of plaintiffs' experts could pinpoint the time of injury. We collect those sites. At page four of our reply brief. I also think the court was right to focus on this intubation versus CPAP as a management choice. That it was, in fact, the testimony from Dr. Partridge and from Dr. Miller. I'd also note that to the extent that plaintiffs are shifting their theory a bit here, and I think they did, that the breach of the standard of care was failure to provide intubation. Dr. Partridge himself testified that the first time intubation was called for here was at 8 PM. That testimony is at JA 530. 8 PM, of course, being more than five hours after Dr. Pruitt stepped in. If the court doesn't have any other questions on liability, I do want to briefly just speak to the collateral source issue. I think the reading of the statute, their argument here really turns on the notion that these pre-verdict settlements were collateral sources. I don't think it falls within the definition if you read it. The definition says, applies to agreements discharging medical bills, not agreements discharging liability. And if there was any doubt on that, if you look at the collateral source hearing statute, that's 557B9A. If you look at subsection G5 of that statute, it explicitly says the collateral source hearing is not the appropriate time for making reductions based on pre-verdict settlements or settlements with other tort feasors. Unless the court has any other further questions. Thank you, Your Honors. Thank you. We will come down and greet counsel, and then hear our next case.
judges: Pamela A. Harris, Julius N. Richardson, A. Marvin Quattlebaum Jr.